IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| MELANIE DECANIO, | ) ) | |
| *Plaintiff* | ) ) ) | |
| v. | ) ) | Case No. 1:25-cv-1980-AJT-IDD |
| DELOITTE & TOUCHE, LLC, et al., | ) ) ) | |
| *Defendants*. | ) ) ) ) | |

## **MEMORANDUM OPINION AND ORDER**

In this employment discrimination action, Plaintiff Melanie Decanio ("Plaintiff") alleges that she was terminated by her former employer, Deloitte & Touche, LLC ("Deloitte") after the sexual assault and harassment she suffered by her former supervisor, Defendant Scott Wilson, was reported to management. Her Complaint asserts against Deloitte claims for sex discrimination and hostile work environment under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e) and the Virginia Human Rights Act ("VHRA;" Va. St. § 2.2-3905) (Counts I, II),[1] and several other claims against Wilson. Pending before the Court is Deloitte's Motion to Dismiss for Failure to State a Claim [Doc. No. 32] (the "Motion").[2] Upon review of the Motion, the memoranda in support thereof and in opposition thereto [Doc. Nos. 44, 49], and for the reasons stated herein, the Motion is **GRANTED** in part and **DENIED** in part.

---

[1] Plaintiff also brings claims for retaliation against Deloitte and wrongful discharge against Deloitte and Wilson (Counts III, IV). Deloitte does not seek dismissal of Plaintiff's retaliation claim (Count III) ([Mot.] at 5 n.1), and Plaintiff does not oppose Deloitte's Motion with respect to Count IV. [Opp.] at 6 n.1.

[2] Deloitte waived oral argument on the Motion. [Doc. No. 36].

1

## I. BACKGROUND

A. Plaintiff's Hiring and Service at Deloitte

Plaintiff alleges the following in her Complaint:

She was recruited by Deloitte while she was an undergraduate student at the College of William & Mary and accepted employment with Deloitte in 2021 as an Audit Assistant in the firm's McLean, Virginia office. [Compl.] ¶¶ 11–12. She quickly passed her CPA examinations, worked on major audit projects, and received strong performance reviews, raises and promotions during her employment. *Id.* at 1; *Id.* ¶¶ 14–16. Among other projects, Plaintiff worked on an audit engagement for Fannie Mae, an entity with trillions of dollars in assets, and became a trusted and reliable employee on the engagement team. *Id.* ¶¶ 14–16, 50. In September 2023, DeCanio joined the "Realterm" audit team and began reporting directly to Defendant Wilson, then a Deloitte senior manager. *Id.* ¶ 17. She and Wilson worked closely together during her first year on the team and she viewed him as a supportive mentor, communicator, and friend. *Id.* ¶ 18. Wilson came to rely upon her to solve problems and assist in managing more junior employees. *Id.* She knew Wilson was married and expecting a child and helped organize the purchase of a baby gift for him from the audit team. *Id.* ¶ 19.

B. Wilson's Alleged Assault and Aftermath

On May 29, 2024, DeCanio attended a Deloitte-sponsored celebration in Annapolis, Maryland, marking the completion of a Realterm audit filing; the event included lunch, a boat trip, drinks, and dinner at the Choptank Restaurant. *Id.* ¶ 20. During the dinner Wilson sat next to Decanio and, while discussing another woman who had previously worked on the team, placed his hand on her thigh under the table and stated that he thought the former employee was "really hot" and that he "would have slept with her." *Id.* ¶ 21. He then whispered to her, "Don't worry, I think

2

the same about you." *Id*. DeCanio received a telephone call that gave her an opportunity to leave the dinner table and move near the restaurant entrance, but Wilson later approached her near the bathrooms, asked whether she had heard what he said at dinner, and ordered her to repeat back his statement that he wanted to have sex with her. *Id*. ¶¶ 22-23. Although DeCanio wanted to leave the restaurant after this interaction, she remained because she was sharing transportation with coworkers who wished to stay longer. *Id*. ¶ 24.

Wilson later texted DeCanio (while both were still at the restaurant) asking to speak privately and directed her to meet him downstairs, which she did and discovered him waiting in a single-person unisex bathroom. *Id*. ¶ 25. When she entered the bathroom, Wilson immediately lunged at her and attempted to kiss her. *Id*. ¶ 26. DeCanio attempted to fend him off by placing her arm against his chest, backing against the wall, turning her head, and repeatedly yelling at him to stop. *Id*. ¶¶ 27-28. Initially undeterred, Wilson shoved her arms out of the way and exclaimed, "I don't care about any of that," before eventually stopping, apologizing, and stating that he had never done anything like that before. *Id*. ¶¶ 28-29. DeCanio returned upstairs visibly upset and crying in front of her coworkers. *Id*. ¶ 29.

Following the incident, DeCanio struggled with whether to report Wilson's conduct to Deloitte management or human resources personnel out of fear that this would damage her career and undermine the positive evaluations Wilson had given her, and also out of shame and embarrassment. *Id*. ¶¶ 30–32. She also struggled emotionally as a result of the assault, keeping it a secret from some loved ones and seeking mental health treatment. *Id*. ¶¶ 31, 34. DeCanio was largely able to avoid Wilson until October or early November 2024 due to his parental leave and her temporary reassignment to a different sub-team pursuant to Deloitte's rotation policy. *Id*. ¶¶ 33, 37. She did contact Wilson during that time in order to ask him not to conduct her performance

review or oversee her work in the future, and he agreed while again apologizing for his conduct at the Choptank event. *Id.* ¶ 36. After she rejoined Wilson's team, however, he changed dramatically from a supportive mentor into an abusive supervisor who demeaned her, singled her out, assigned her extra work, and imposed crushing deadlines. *Id.* ¶ 38. On or about February 13, 2025, DeCanio attended another team social event at a local restaurant, during which Wilson observed her speaking with a male coworker and later warned her not to sleep with him. *Id.* ¶¶ 39-40. Retraumatized, she confronted Wilson outside the restaurant and told him that his comments were inappropriate and that her personal life was none of his business. *Id.* ¶ 41. Noticing DeCanio's distress after this interaction, another coworker informed Plaintiff that she planned to report Wilson to management because the work environment for Plaintiff was "not healthy" and did so soon afterward. *Id.* ¶¶ 42-43.

C. Deloitte's Investigation of and Response to Wilson's Misconduct

Within a week of that reporting by Plaintiff's co-worker, Deloitte began an investigation which, according to the Complaint, focused on Plaintiff's conduct rather than Wilson's, and included questions suggesting that she provoked Wilson's behavior. *Id.* ¶ 43–46. Plaintiff was interviewed by Deloitte human resources personnel and members of Deloitte's legal department for approximately two hours on March 6, 2025 and was then placed on "involuntary administrative leave." *Id.* ¶ 46. On March 10, 2025, Deloitte informed her that she was being terminated "for cause" due to purported breaches of approved audit testing methodologies; and she subsequently learned that Wilson was also fired for the same reason. *Id.* ¶¶ 47-48.

The auditing issue relied upon by Deloitte for Plaintiff's termination, which she alleges was pretextual, involved a discrepancy of approximately $115 in a $4.3 trillion-dollar Fannie Mae audit, while Deloitte's own auditing standards allegedly treat discrepancies of less than $100

4

million on such an audit as "clearly trivial." *Id.* ¶¶ 50–62. Plaintiff had no prior disciplinary history, had never previously been accused of violating Deloitte policy, and was terminated without prior warning or counseling. *Id.* ¶¶ 16, 62. After her termination, Deloitte offered Plaintiff approximately $50,000 in severance pay in exchange for a release of claims, which she rejected. *Id.* at 3.

    D. <u>Procedural History</u>

Plaintiff filed a charge of discrimination with the EEOC on or about August 8, 2025, alleging violations of Title VII and the Virginia Human Rights Act; and the EEOC issued a right-to-sue notice on the same date, *Id.* ¶¶ 3-4.  Plaintiff filed the this action on November 6, 2026, asserting claims against Deloitte under both Title VII and the VHRA for sex discrimination (Count I), hostile work environment (Count II) and retaliation (Count III) [Compl.] ¶¶ 67-91); and wrongful discharge in violation of public policy against both Deloitte and Wilson (Count IV); *Id.* ¶¶ 92–95), together with claims against Wilson for battery and intentional infliction of emotional distress (Counts V, VI; Id. ¶¶ 96–104). Deloitte filed the Motion on January 20, 2026, and Wilson filed his own motion to dismiss Counts IV and VI on March 4, 2026 [Doc. No. 51], which the Court denied at an April 8, 2026 hearing. [Doc. No. 58].

## II. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This does not require detailed allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "When a . . . complaint contains sufficient allegations of material facts to inform a defendant of the nature and character of the claim, it is

unnecessary for the pleader to descend into statements giving details of proof in order to withstand [a motion to dismiss]." *Squire v. Va. Hous. Dev. Auth.*, 287 Va. 507, 517 (2014) (quoting *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 24 (1993)). The Court must accept all well-pled facts in the complaint as true and construe all facts in the light most favorable to Plaintiffs. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015).

### III. DISCUSSION

In the Motion, Deloitte seeks (1) dismissal of Plaintiff's Title VII and VHRA claims in Counts I-III on the grounds that the events at the Choptank Restaurant on May 29, 2024 occurred more than 300 days before her EEOC complaint and are therefore time-barred; and dismissal of her hostile work environment and disparate treatment claim in Counts I-II on the grounds that Plaintiff has failed as a matter of law to allege facts sufficient to give rise to either claim.[3]

A. Plaintiff's Hostile Work Environment Claim Survives (Count II)

i. *The Hostile Work Environment Claim is Not Time-Barred*

Deloitte first argues that Plaintiff's hostile work environment claim based on Title VII and Virginia Human Rights Act ("VHRA") is untimely to the extent it relies upon the alleged May 2024 Choptank Restaurant incident, because she did not file her EEOC charge until August 8, 2025 and, as a result, the Choptank incident occurred outside the applicable 300-day statute of limitations. [Mot.] at 7–8.

Plaintiff does not meaningfully dispute that a claim based solely on the Choptank Restaurant incident would be time-barred, but contends that the timeliness of her hostile work environment claims under Title VII and VHRA depends on whether the "continuing violation"

---

[3] Plaintiff has alleged in Count I "sex discrimination" that, in substance, is in large part duplicative of her hostile work environment claim alleged in Count II. The Court will therefore consider on a consolidated basis her hostile work environment claim under both Counts I and II, leaving for the Court's separate consideration under Count I her residual "disparate treatment" claim,

doctrine applies. That doctrine holds that "a  hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice … [and] [p]rovided that an act <u>contributing</u> to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221–22 (4th Cir. 2016) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)) (emphasis in original).

Deloitte contends that the continuing violation doctrine does not apply because Plaintiff "fails to allege a timely hostile work environment or any 'unlawful employment practice' within the limitations period to which the Choptank dinner could be linked," and because the timely conduct is insufficiently related (both in substance and temporally) to the Choptank Restaurant incident. [Mot.] at 15–17.

In substance, Deloitte's position is that continuing violation doctrine requires that conduct constituting an independently-actionable hostile work environment or other unlawful employment practice must occur within the limitations period before otherwise time-barred conduct may be relied upon to establish a claim. But the interpretation that a plaintiff must "allege a timely hostile work environment…within the limitations period" would entirely nullify the doctrine, and has been expressly rejected by the Fourth Circuit in *Gilliam v. S.C. Dep't of Juv. Just.,* 474 F.3d 134, 141 (4th Cir. 2007) ("[I]n light of the statement of law in *Morgan* for hostile work environment claims, the district court erred in concluding that [the plaintiff] needed to show a discrete act of discrimination within the relevant time period") (quoting *Jensen v. Henderson,* 315 F.3d 854, 859 (8th Cir.2002). Furthermore, neither the six-month gap in Wilson's supervision of DeCanio, nor the non-sexual nature (according to Deloitte) of the timely conduct defeat the doctrine's applicability. In that regard, the temporal gap resulted from staffing

decisions and Wilson's parental leave rather than any genuine cessation of hostility, [Opp.] at 10–13; and Wilson's alleged hostile and demeaning treatment of Plaintiff, which included "g[iving] her extra work, which often had crushing deadlines" and "regularly singl[ing] [her] out to be the target of [his] wrath," along with Wilson's February 2025 sex-related comments (*Id*. ¶ 38) plausibly reflect retaliation for her rejection of his sexual advances at the Choptank. Therefore, even if not independently actionable, these instances are sufficiently related to the series of hostile and discriminatory acts that began with the Choptank Restaurant assault.

Based on the allegations of the Complaint, Plaintiff has alleged facts that make plausible under the continuing violation doctrine her hostile work environment claims under Title VII and VHRA, and those claims are not time-barred.

### ii. Plaintiff States a Claim for Sex Discrimination Based on a Hostile Work Environment

Deloitte also contends that the Complaint fails to state a hostile work environment claim under Title VII and the VHRA, even if timely filed.

"[A] claim of 'hostile environment' sex discrimination is actionable under Title VII," *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986), and the liability imposed by the VHRA is coextensive with Title VII for purposes of this Motion. *See Lundberg v. Delta Response Team, LLC*, No. 3:23CV00042, 2024 WL 1676806, at *3 (W.D. Va. Apr. 18, 2024). Specifically, for a hostile work environment claim, Plaintiff must plead (1) conduct that was not merely unwelcome but plainly nonconsensual and inappropriate; (2) conduct based on the employee's gender; (3) conduct sufficiently severe or pervasive to alter the conditions of employment and create a hostile or abusive environment; and (4) a basis for imputing liability to the employer). *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 117 (4th Cir. 2021).

Deloitte disputes only the third element, contending that the Complaint fails to allege instances of harassment or other discrimination "sufficiently severe or pervasive to alter [Plaintiff's] conditions of employment and create an abusive work environment," as required to state a claim. [Mot.] at 13.[4]

Based on the totality of the allegations, when viewed most favorably to the Plaintiff, she has plausibly alleged conduct that was "sufficiently severe or pervasive to alter [Plaintiff's] conditions of employment and create an abusive work environment," as evidenced by, *inter alia*, the fact that Plaintiff's colleague (who presumably did not witness the Choptank assault itself as it took place in a single-person bathroom) took it upon herself, based on her observations, to report Wilson to Human Resources ([Compl.] ¶ 42), and that that the Complaint plausibly alleges that Deloitte management was so concerned about potential fallout from the controversy that it terminated two otherwise high-performing employees based on a pretext.

B.  Plaintiff Does Not State a Claim of Sex Discrimination based on Disparate Treatment (Count I)

Plaintiff's Count I purports to state a claim for sex discrimination based on disparate treatment. Unlike her hostile work environment claim, Count I does not implicate the continuing violation doctrine and requires Plaintiff to allege "discrete act(s)" of discrimination adversely affecting the terms of her employment within the statute of limitations. The only adverse employment action within the statutory limitations period on which Plaintiff may rely is her termination. *Credle v. Virginia Cmty. Coll. Sys.,* No. 3:24CV233-DJN, 2025 WL 27827, at *7 (E.D. Va. Jan. 3, 2025), *aff'd*, No. 25-1072, 2026 WL 509313 (4th Cir. Feb. 24, 2026) ("To rise to

---

[4] Deloitte's position in this regard rests primarily on the purported inapplicability of the continuing violation doctrine, a contention the Court rejects, and Deloitte does not appear to contend that the Complaint's allegations are insufficient when considered in light of the Choptank Restaurant incident.

9

the level of an adverse employment action absent termination, the misconduct must be more than something that offends the employee, and instead must materially alter "the terms, conditions, or benefits" of the plaintiff's employment").

Deloitte contends that Plaintiff failed to plausibly allege sex discrimination under Title VII with respect to her termination. In that regard, Deloitte points to factors including the Complaint's failure to allege that Wilson made the decision to terminate her or was involved in that decision; the lack of a comparator; and the Complaint's allegation that Wilson himself was fired for the same putative performance-based reason as Plaintiff. [Mot.] at 20–21.

To state a claim under Count I, Plaintiff must allege facts which would plausibly show discrimination either directly or through the rubric of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 902–05 (1973). "Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory [or retaliatory] attitude, and (2) bear directly on the contested employment decision." *Laing v. Fed. Express Corp.,* 703 F.3d 713, 717 (4th Cir. 2013). Plaintiff has failed to allege facts which directly establish discrimination, as none of the conduct or statements she attributes to any of her supervisors directly reflects such an animus or bears on her termination. She therefore must plead a prima facie case for discriminatory termination under the *McDonnell Douglas* rubric by alleging facts plausibly showing that (1) Plaintiff was a member of a protected group; (2) Plaintiff was terminated; (3) Plaintiff was qualified to remain in her position; and (4) the position remained open to similarly qualified applicants after Plaintiff's dismissal. *See Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 (4th Cir. 1989). Once a prima facie case has been established, the burden would then shift to the Defendant to articulate a non-discriminatory reason for the termination, in response to which the

Plaintiff must present evidence that the reason given was not the real reason but rather a pretext for discrimination. *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021).

As an initial matter, Plaintiff's discrimination claim is indistinguishable from her retaliation claim. In that regard, the Complaint alleges that after her colleague reported Wilson's harassment, Deloitte leadership launched an investigation that focused not on the harassment itself but rather on Plaintiff's potential wrongdoing, and ultimately terminated both her and Wilson on the pretext that they committed what appears to be a minor breach of accounting guidelines during the Fannie Mae audit. [Compl.] ¶¶ 43-64. Specifically, Plaintiff alleges that the dual termination were a deliberate attempt to cover up Wilson's abuse and avoid potential scandal and liability. *Id*. ¶ 48 ("Seeking to wipe away history and thus its own culpability, Deloitte also fired Wilson – not for sexually harassing and assaulting Ms. DeCanio, but for breaching accounting protocol."). And there appears to be no difference in substance as between the factual basis for her claim of sex discrimination in connection with her termination and her claim that her termination was in retaliation for protected activity, *i.e.*, the reporting by her colleague of Wilson's sexual harassment of Plaintiff, and is therefore duplicative of her Count III, which Deloitte does not seek to dismiss in the Motion. *See, e.g. Foster v. Univ. of Maryland-E. Shore,* 787 F.3d 243, 256 (4th Cir. 2015) (finding that the plaintiff proved a prima facie case for her claim of retaliatory termination based on her reporting of sexual harassment, but not for her claims of discriminatory discharge and hostile work environment).

Nor does the Complaint allege an adequate comparator, or that Plaintiff's position remained open to similarly qualified applicants after her firing, as would support a sex discrimination claim. While a discrimination plaintiff is not required as a matter of law to point

to a comparator,[5] the facts alleged in support of its sex discrimination claim fail to otherwise allow the reasonable inference that her termination was related to her sex, rather than the reporting of her harassment. *See Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019) (To allege the existence of different treatment, Plaintiff must show that another employee "similarly-situated in all respects" was treated more favorably than she) (citation omitted); *see also Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). For the above reasons, the Complaint fails to allege facts that plausibly allege that her termination was based on her sex and the disparate treatment claim in Count I will be dismissed.

## IV. CONCLUSION

For the reasons set forth above, it is hereby:

**ORDERED** that the Motion [Doc. No. 32] be, and the same hereby is, **GRANTED** as to Plaintiff's disparate treatment claim in Count I and her wrongful discharge claim in Count IV, and those claims are **DISMISSED**; and the Motion is otherwise **DENIED**.

The clerk is directed to forward copies of this order to all counsel of record.

_____
Anthony J. Trenga
Senior U.S. District Judge

June 24, 2026
Alexandria, Virginia

---

[5] *See Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017), as amended (Aug. 11, 2017) ("A plaintiff is not required to identify a similarly situated [] comparator to prove her discrimination claim, so long as [he] can establish an inference of unlawful discrimination through other means.") (citing *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545-46 (4th Cir. 2003)).